Filed 9/19/16

# IN THE SUPREME COURT OF CALIFORNIA

FRIENDS OF THE COLLEGE OF )
SAN MATEO GARDENS, )
                          )
         Plaintiff and Respondent, )
                          )             S214061
         v. )
                          )     Ct.App. 1/1 A135892
SAN MATEO COUNTY COMMUNITY )
COLLEGE DISTRICT et al., )
                          )      San Mateo County
         Defendants and Appellants. )   Super. Ct. No. CIV 508656
_____ )

       To ensure that governmental agencies and the public are adequately informed about the environmental impact of public decisions, the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) requires a lead agency (*id.*, § 21067) to prepare an environmental impact report (EIR) before approving a new project that "may have a significant effect on the environment." (*Id.*, § 21151, subd. (a).) When changes are proposed to a project for which an EIR has already been prepared, the agency must prepare a subsequent or supplemental EIR only if the changes are "[s]ubstantial" and require "major revisions" of the previous EIR. (*Id.*, § 21166.) Guidelines promulgated by the state Natural Resources Agency (Resources Agency) extend this subsequent review framework to projects for which a negative declaration was initially adopted, and no EIR prepared, because the agency had concluded the project

1

would have no potentially significant environmental effects. (Cal. Code Regs., tit. 14, § 15162; hereafter CEQA Guidelines.)

In this case, a community college district proposed a district-wide facilities improvement plan that called for demolishing certain buildings and renovating others. The district approved the plan after determining that it would have no potentially significant, unmitigated effect on the environment. Years later, the district proposed changes to the plan. The changes included a proposal to demolish one building complex that had originally been slated for renovation, and to renovate two other buildings that had originally been slated for demolition. The district approved the changes after concluding they did not require the preparation of a subsequent or supplemental EIR under Public Resources Code section 21166 (section 21166) and CEQA Guidelines section 15162. The Court of Appeal invalidated the district's decision, finding it "clear" as a matter of law that the district's proposed demolition of the building complex was not merely a change to its previously approved project, but a new project altogether. The court ruled that the district's proposal was therefore subject to the initial environmental review standards of Public Resources Code section 21151 (section 21151) rather than the subsequent review standards of section 21166 and CEQA Guidelines section 15162.

We conclude that the Court of Appeal erred in its application of this new project test. When an agency proposes changes to a previously approved project, CEQA does not authorize courts to invalidate the agency's action based solely on their own abstract evaluation of whether the agency's proposal is a new project, rather than a modified version of an old one. Under the statutory scheme, the agency's environmental review obligations depend on the effect of the proposed changes on the decisionmaking process, rather than on any abstract characterization of the project as "new" or "old." An agency that proposes project

2

changes thus must determine whether the previous environmental document retains any relevance in light of the proposed changes and, if so, whether major revisions to the previous environmental document are nevertheless required due to the involvement of new, previously unstudied significant environmental impacts. These are determinations for the agency to make in the first instance, subject to judicial review for substantial evidence.

## I.

## A.

"In CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to '[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions.' " (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 (*No Oil*).) At the "heart of CEQA" (CEQA Guidelines, § 15003, subd. (a)) is the requirement that public agencies prepare an EIR for any "project" that "may have a significant effect on the environment." (§ 21151, subd. (a); see *id*., §§ 21080, subd. (a), 21100, subd. (a).) The purpose of the EIR is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.) The EIR thus works to "inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made," thereby protecting " 'not only the environment but also informed self-government.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564, quoting *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).)

Under CEQA and its implementing guidelines, an agency generally conducts an initial study to determine "if the project may have a significant effect on the environment." (CEQA Guidelines, § 15063, subd. (a).) If there is substantial evidence that the project may have a significant effect on the environment, then the agency must prepare and certify an EIR before approving the project. (*No Oil*, *supra*, 13 Cal.3d at p. 85; see also Pub. Resources Code, §§ 21100 [state agencies], 21151 [local agencies].) On the other hand, no EIR is required if the initial study reveals that "there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment." (CEQA Guidelines, § 15063, subd. (b)(2).) The agency instead prepares a negative declaration "briefly describing the reasons that a proposed project . . . will not have a significant effect on the environment and therefore does not require the preparation of an EIR." (*Id.*, § 15371; see *id*., § 15070.) Even when an initial study shows a project may have significant environmental effects, an EIR is not always required. The public agency may instead prepare a mitigated negative declaration (MND) if "(1) revisions in the project plans . . . before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (Pub. Resources Code, § 21064.5.)

For many projects, this is the end of the environmental review process. But like all things in life, project plans are subject to change. When such changes occur, section 21166 provides that "no subsequent or supplemental environmental impact report shall be required" unless at least one or more of the following occurs: (1) "[s]ubstantial changes are proposed in the project which will require major revisions of the environmental impact report," (2) there are "[s]ubstantial

4

changes" to the project's circumstances that will require major revisions to the EIR, or (3) new information becomes available. (§ 21166.)

Although section 21166 does not, by its terms, address cases in which a negative declaration or an MND, rather than an EIR, has been prepared, CEQA Guidelines section 15162 provides that no subsequent EIR is required either "[w]hen an EIR has [previously] been certified *or* [when] a negative declaration [has previously been] adopted for a project," unless there are substantial changes to a project or its circumstances that will require major revisions to the existing EIR or negative declaration. (CEQA Guidelines, § 15162, subd. (a), italics added; see also § 21166.) "If changes to a project or its circumstances occur or new information becomes available after adoption of a negative declaration," and if no subsequent EIR is required, the agency "shall determine whether to prepare a subsequent negative declaration, an addendum, or no further documentation." (CEQA Guidelines, § 15162, subd. (b).) CEQA Guidelines further provide that an agency must prepare an addendum to a previously certified EIR "if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR have occurred." (*Id.*, § 15164, subd. (a).) An addendum to an adopted negative declaration "may be prepared if only minor technical changes or additions are necessary or none of the conditions described in Section 15162 calling for the preparation of a subsequent EIR or negative declaration have occurred." (*Id.*, § 15164, subd. (b).)

**B.**

This case arises from a series of proposed facilities improvements to a college campus in San Mateo County. In 2006, the San Mateo Community College District and its Board of Trustees (collectively, District) adopted a facilities master plan (Plan) proposing nearly $1 billion in new construction and facilities renovations at the District's three college campuses. At the College of

5

San Mateo (College), the District's Plan included a proposal to demolish certain buildings and renovate others. The buildings slated for renovation included the College's "Building 20 complex," which includes a small cast-in-place concrete classroom and lab structure, greenhouse, lath house, surrounding garden space, and an interior courtyard.

In 2006, the District published an initial study and mitigated negative declaration analyzing the physical environmental effects of implementing the Plan's proposed improvements at the College, including the proposed rehabilitation of the Building 20 complex. The MND stated that, with the implementation of certain mitigation measures, the Plan would not have a significant effect on the environment. In 2007, the District certified its initial study and adopted the 2006 MND.

When the District later failed to obtain funding for the planned Building 20 complex renovations, it re-evaluated the proposed renovation. In May 2011, the District issued a notice of determination, indicating that it would instead demolish, rather than renovate, the "complex and replace it with parking lot, accessibility, and landscaping improvements." The District also proposed to renovate two other buildings, buildings 15 and 17, that had previously been slated for demolition.

The District concluded a subsequent or supplemental EIR was not required. It instead addressed the change through an addendum to its 2006 initial study and MND, concluding that "the project changes would not result in a new or substantially more severe impact than disclosed in the 2006 [initial study and mitigated negative declaration]. Therefore, an addendum . . . is the appropriate CEQA documentation." (San Mateo County Community College Dist., CEQA Addendum: Evaluation of Project Change to Building 20 Complex (May 2011) p. 20.)

6

The newly proposed demolition of the Building 20 complex, and particularly the demolition of the complex's associated gardens, proved controversial. Certain members of the public, as well as a number of College students and faculty, vocally criticized the demolition proposal at public hearings. The District nevertheless approved demolition of the Building 20 complex in accordance with the addendum.

Plaintiff Friends of the College of San Mateo Gardens filed suit challenging the approval. The District thereafter rescinded its original addendum and issued a revised addendum in August 2011. The revised addendum reiterated the original addendum's conclusion but bolstered its analysis. On August 24, 2011, after public comment and discussion, the revised addendum was adopted and demolition of the Building 20 complex was reapproved. Plaintiff voluntarily dismissed its prior suit and filed the present action, challenging the revised addendum and the reapproval of the demolition. Plaintiff sought a peremptory writ of mandate ordering the District to set aside its approval of the Building 20 complex demolition and to fully comply with CEQA, including preparing an adequate EIR and adopting feasible alternatives and mitigation measures. The trial court found that the demolition project was inconsistent with the previously approved plan and that its impacts were not addressed in the 2006 mitigated negative declaration. The trial court thus granted plaintiff's petition for a writ of mandate, ordering the District to refrain from taking further action adversely affecting the physical environment at the Building 20 complex pending the District's full compliance with CEQA.

The Court of Appeal affirmed. Relying primarily on *Save Our Neighborhood v. Lishman* (2006) 140 Cal.App.4th 1288 (*Save Our Neighborhood*), the court concluded, as a threshold matter of law, that the proposed building demolition was a new project, rather than a project

7

modification.  The court accordingly concluded that the agency is required to engage in an initial study of the project to determine whether an EIR is required under section 21151.

In so holding, the Court of Appeal deepened a disagreement among the appellate courts concerning the reasoning of *Save Our Neighborhood*, *supra*, 140 Cal.App.4th 1288.  In *Save Our Neighborhood*, the Court of Appeal invalidated an agency's approval of a proposed modification to a project that had previously been approved via negative declaration.  Although the original project and the proposed modification involved "the same land and . . . similar mixes of uses," there were a number of differences.  (*Id.* at p. 1300 [the original project was a 106-unit motel that included some 15,000 square feet of other retail uses; the purported modification was a 102-unit hotel that did not include any separate retail uses and was sponsored by a different developer than the original project].)  The court held that the agency had erroneously relied on the statutory and regulatory provisions governing the preparation of subsequent or supplemental EIRs because the proposal was not a modification at all but rather a "new project altogether."  (*Id.* at p. 1301.)  The court concluded that whether the proposal constituted a "new project" was "a threshold question" of law and rejected the agency's determination to treat the proposal as a modification after reviewing that question de novo. (*Ibid.*)

*Save Our Neighborhood* was criticized in *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1400 (*Mani Brothers*).  In *Mani Brothers*, the agency certified an EIR for an original project consisting of "five buildings with . . . offices, a 550- to 770-room hotel, retail facilities, and an optional cultural center."  (*Id.* at p. 1389.)  Fifteen years later, the project's developer proposed to revise the project, including by "reduc[ing] much of the [o]riginal [p]roject's office and retail space, and eliminat[ing] the optional culture

8

use component, while maintaining the hotel component and adding residential components," which increased the overall size of the project from "approximately 2.7 million square feet to a maximum of just over 3.2 million square feet." (*Id.* at p. 1391.) The *Mani Brothers* court affirmed the agency's determination that the proposal was a modification of an existing project and found the agency's conclusion that no supplemental EIR was required to be supported by substantial evidence. (*Id.* at pp. 1398–1399.) The court distinguished *Save Our Neighborhood*, *supra*, 140 Cal.App.4th 1288, on the ground that it "involved an addendum to a previously certified negative declaration and not . . . an addendum to a previously certified EIR." (*Mani Brothers*, at p. 1400.) But the court also opined that, even if it were not distinguishable, *Save Our Neighborhood*'s "fundamental analysis is flawed." (*Mani Brothers*, at p. 1400.) The court explained that *Save Our Neighborhood*'s threshold " 'new project' test . . . inappropriately bypassed otherwise applicable statutory and regulatory provisions," and "undermine[d] the deference due the agency." (*Mani Brothers*, at pp. 1400–1401; see also Pub. Resources Code, § 21083.1.)

The Court of Appeal in this case acknowledged the disagreement between *Save Our Neighborhood* and *Mani Brothers*. It concluded, however, that "in the narrow circumstances of the present case, where it is clear from the record that the nature of the project has fundamentally and qualitatively changed to the point where the new proposal is actually a new project altogether," the approach adopted in *Save Our Neighborhood* "is both workable and sound."[1] Here, the

[1]  Shortly after issuing its decision in this case, the same division of the Court of Appeal issued a decision in which it declined to apply the *Save Our Neighborhood* new project test to review a city's determination that changes to a previously approved project did not require a supplemental or subsequent EIR. (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 201–202.)

*(Footnote continued on next page.)*

9

court observed, the District's 2011 addendum "changes 'renovation' of the Building 20 complex to 'demolition' of the complex's buildings and a substantial portion of the gardens." The court concluded: "[A]t least under the straightforward facts of the present case we can decide, as a matter of law, that the demolition project is a 'new project.' "

The Court of Appeal acknowledged the District's argument that the proposal to demolish the Building 20 complex is only one component of the District's project, which, as revised, now proposes to renovate two buildings that had previously been slated for demolition. Relying on *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307 (*Sierra Club*), however, the Court of Appeal concluded that when an agency initially adopts a broad, large-scale environmental document — such as the 2006 MND here — that addresses the "environmental effects of a complex long-term management plan" (*id.* at p. 1316), a court can find a material alteration regarding a particular site or activity covered by that plan to be a new project triggering environmental review under section 21151.

## II.

Once a project has been subject to environmental review and received approval, section 21166 and CEQA Guidelines section 15162 limit the circumstances under which a subsequent or supplemental EIR must be prepared. These limitations are designed to balance CEQA's central purpose of promoting consideration of the environmental consequences of public decisions with interests

_____

*(Footnote continued from previous page.)*

Explaining that " 'a court should tread with extraordinary care before reversing a local agency's determination about the environmental impact of changes to a project,' " the court instead "elect[ed] to evaluate the City's decision to proceed under section 21166 using the substantial evidence test." (*Id.* at p. 202.)

10

in finality and efficiency.  (See *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1074 (*Bowman*).)  Thus, as both *Save Our Neighborhood* and *Mani Brothers* explained:  "The purpose behind the requirement of a subsequent or supplemental EIR or negative declaration is to explore environmental impacts not considered in the original environmental document. . . .  The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis.  Only changed circumstances . . . are at issue." (*Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1296; accord, *Mani Brothers*, *supra*, 153 Cal.App.4th at pp. 1398–1399.)

Consistent with these principles, section 21166 and CEQA Guidelines section 15162 provide that an agency that proposes changes to a previously approved project must determine whether the changes are "[s]ubstantial" and "will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects."  (CEQA Guidelines, § 15162, subd. (a)(1).)  If the proposed changes meet that standard, then a subsequent or supplemental EIR is required.

Drawing on the reasoning of *Save Our Neighborhood*, plaintiff argues that implicit in the statutory and regulatory scheme is a threshold inquiry that determines whether the subsequent review provisions properly apply in the first place.  Because section 21166 and CEQA Guidelines section 15162 both refer to substantial changes to "*a project*" — and not, as the *Save Our Neighborhood* court observed, changes to "a new project proposed for a site where a similar project was previously approved" — a court reviewing an agency's proposed approval of project changes must first satisfy itself that the project remains the same project as before, rather than an entirely new project, before proceeding to evaluate whether the changes call for a subsequent or supplemental EIR under CEQA's subsequent

11

review provisions.  (*Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1297.) Plaintiff further argues that whether an agency's proposal qualifies as a new project is a question of law for courts to decide based on their independent judgment.  The premise of plaintiff's argument is sound, but its conclusions are not.

Plaintiff is correct that the subsequent review provisions can apply only if the project has been subject to initial review; they can have no application if the agency has proposed a new project that has not previously been subject to review. But plaintiff's approach would assign to courts the authority — indeed, the obligation — to determine whether an agency's proposal qualifies as a new project, in the absence of any standards to govern the inquiry.  Plaintiff does not suggest any standards, nor do the cases on which it relies.  The *Save Our Neighborhood* court simply asserted that the modified project proposal at issue was a new project, pointing out that while the "projects" at issue involved the "same land" and a "similar mix[] of uses," they "ha[d] different proponents and there [was] no suggestion the latter project utilized any of the drawings or other materials connected with the earlier project . . ." (*Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1300).  The court neither purported to give any content to the determination whether a proposal counts as a new project, nor did it explain why the distinctions it identified make any difference for purposes of CEQA, whose aim is simply to "compel government . . . to make decisions with environmental consequences in mind."  (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283.)  The Court of Appeal in this case likewise offered no standards to guide the inquiry, simply declaring it "clear" that the proposal at issue constituted a "new project."

In the absence of any benchmark for measuring the newness of a given project, the new project test plaintiff urges would inevitably invite arbitrary

12

results.  As the Court of Appeal in *Mani Brothers* observed, to ask whether an agency proposal constitutes a " 'new project' " in the abstract "does not provide an objective or useful framework.  Drastic changes to a project might be viewed by some as transforming the project to a *new* project, while others may characterize the same drastic changes in a project as resulting in a dramatically *modified* project.  Such labeling entails no specific guidelines and simply is not helpful to our analysis." (*Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1400.)

What is more, to ask whether proposed agency action constitutes a new project, purely in the abstract, misses the reason why the characterization matters in the first place.  The central purpose of CEQA is to ensure that agencies and the public are adequately informed of the environmental effects of proposed agency action.  The subsequent review provisions, as *Save Our Neighborhood* recognized, are accordingly designed to ensure that an agency that proposes changes to a previously approved project "explore[s] environmental impacts not considered in the original environmental document." (*Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1296.)  This assumes that at least *some* of the environmental impacts of the modified project were considered in the original environmental document, such that the original document retains some relevance to the ongoing decisionmaking process.  A decision to proceed under CEQA's subsequent review provisions must thus necessarily rest on a determination — whether implicit or explicit — that the original environmental document retains some informational value.  If the proposed changes render the previous environmental document wholly irrelevant to the decisionmaking process, then it is only logical that the agency start from the beginning under section 21151 by conducting an initial study to determine whether the project may have substantial effects on the environment.

It follows that, for purposes of determining whether an agency may proceed under CEQA's subsequent review provisions, the question is not whether an

agency's proposed changes render a project new in an abstract sense. Nor does the inquiry turn on the identity of the project proponent, the provenance of the drawings, or other matters unrelated to the environmental consequences associated with the project. (Cf. *Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1300.) Rather, under CEQA, when there is a change in plans, circumstances, or available information after a project has received initial approval, the agency's environmental review obligations "turn[] on the value of the new information to the still pending decisionmaking process." (*Marsh v. Oregon Natural Resources Council* (1989) 490 U.S. 360, 374 (*Marsh*).)[2] If the original environmental document retains some informational value despite the proposed changes, then the agency proceeds to decide under CEQA's subsequent review provisions whether project changes will require major revisions to the original environmental document because of the involvement of new, previously unconsidered significant environmental effects. [3]

---

[2]   In this respect, CEQA resembles the federal statute on which it was modeled. (See *Marsh*, *supra*, 490 U.S. at p. 374 [agencies employ a " 'rule of reason' " in determining whether to issue a supplemental environmental impact statement under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.]; *Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d 553, 565, fn. 4 ["CEQA was modeled on the National Environmental Policy Act (NEPA)" and " 'we have consistently treated judicial and administrative interpretation of the latter enactment as persuasive authority in interpreting CEQA.' "].)

[3]   As a practical matter, if proposed modifications have rendered the prior environmental review wholly irrelevant to the ongoing decisionmaking process, and if the modifications create potentially significant environmental impacts, the two inquiries will yield substantially the same result: the agency must prepare an EIR. Although CEQA distinguishes "subsequent EIRs" (§ 21166) from initial EIRs (see § 21151), both types of EIRs are subject to the same general procedural and substantive requirements. (See generally Pub. Resources Code, § 21061 [defining environmental impact report]; see also *id.*, §§ 21100, 21100.1

*(Footnote continued on next page.)*

14

This understanding of the relevant statutory framework supplies the benchmark missing from the Court of Appeal's application of the new project test in this case. It also exposes the court's error in treating the new project inquiry as a question for the court's independent determination under a de novo standard. Plaintiff, seeking to defend the court's chosen standard of review, likens the new project inquiry to the inquiry whether a particular activity qualifies as a project within the meaning of CEQA. (See *Save Our Neighborhood*, *supra*, 140 Cal.App.4th at p. 1297; cf. *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131; *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382; *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 795–798.) The comparison fails. Whether a proposed activity is a project within the meaning of CEQA is, as we have recognized, a predominantly legal question, for it depends on whether "undisputed data in the record on appeal" satisfy the detailed statutory definition of the term "project." (*Muzzy Ranch Co.*, *supra*, 41 Cal.4th at p. 382, citing Pub. Resources Code, § 21065 [defining "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment"].) But whether an initial environmental document remains relevant despite changed plans or circumstances — like the question whether an initial environmental document requires major revisions due to changed plans or circumstances — is a predominantly factual question. It is thus a question for the agency to answer in the first instance, drawing on its particular

_____

*(Footnote continued from previous page.)*

[information to be included], 21104, 21153 [consultation requirements], 21091–21092 [public notice and comment].)

15

expertise. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 215.) A court's task on review is then to decide whether the agency's determination is supported by substantial evidence; the court's job " ' "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Ibid.*)

We expect occasions when a court finds no substantial evidence to support an agency's decision to proceed under CEQA's subsequent review provisions will be rare, and rightly so; "a court should tread with extraordinary care" before reversing an agency's determination, whether implicit or explicit, that its initial environmental document retains some relevance to the decisionmaking process. (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1052, fn. 6.)[4] But this is only the first step. Once a court determines that substantial evidence supports an agency's decision to proceed under CEQA's subsequent review provisions (see § 21166; CEQA Guidelines, § 15162), the next — and critical — step is to determine whether the agency has properly determined *how* to comply with its obligations under those provisions. In particular, where, as here, the agency has determined that project changes will not require "major revisions" to its initial environmental document, such that no subsequent or supplemental EIR is required, the reviewing court must then proceed to ask whether substantial evidence supports that determination. As explained below, judicial review must reflect the exacting standard that an agency must apply when changes are made to a project that has been approved via a negative declaration.

---

[4] As noted, an agency's decision to proceed under CEQA's subsequent review provisions necessarily incorporates an implicit conclusion that the original environmental document retains at least some degree of relevance. Nothing in the statute requires the agency to make an explicit finding to that effect.

**III.**

Perhaps anticipating our disagreement with the Court of Appeal's formulation and application of *Save Our Neighborhood*'s new project test, plaintiff asks us to affirm the judgment below on the alternative ground that CEQA's subsequent review provision, section 21166, applies only to projects for which an initial EIR was prepared. Plaintiff urges us to hold that CEQA Guidelines section 15162 is invalid to the extent that it extends the section 21166 subsequent review framework to projects that were initially approved via negative declaration, like the campus improvement project at issue in this case.[5]

The Resources Agency, as the "agency with primary responsibility for statewide implementation of CEQA," promulgated CEQA Guidelines section 15162 in accordance with its statutory obligation to establish guidelines for CEQA's implementation. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 378; see Pub. Resources Code, § 21083.) These Guidelines, we have said, are "central to the statutory scheme"; they "serve to make the CEQA process tractable for those who must administer it, those who must comply with it, and ultimately, those members of the public who must live with its consequences." (*California Building Industry Assn.*, *supra*, 62 Cal.4th at pp. 384–385.) Although we have "not [yet] decided . . . whether the Guidelines are regulatory mandates or only aids to interpreting CEQA" (*Laurel*

---

[5] Plaintiff did not raise this issue in its response to the petition for review, and indeed conceded in its opening brief that the "point has not been at issue in this case." At oral argument, however, both parties focused on this issue rather than on the issue on which we had granted review. Concluding that a full response to the issue presented requires resolution of plaintiff's claim that CEQA Guidelines section 15162 is invalid as applied to projects initially approved by negative declaration, we solicited supplemental briefing from the parties and the Resources Agency to address it.

17

*Heights*, *supra*, 47 Cal.3d at p. 391, fn. 2), we have nevertheless concluded that the Guidelines are owed deference insofar as they reflect the agency's specialized knowledge and expertise and were adopted through a process of notice and public comment under the California Administrative Procedure Act. (*California Building Industry Assn.*, *supra*, 62 Cal.4th at pp. 381, 389–390.) Thus, we afford the Guidelines "great weight" unless a provision is "clearly unauthorized or erroneous under the statute." (*Id.* at p. 381.)

Plaintiff argues that CEQA Guidelines section 15162 is clearly erroneous because section 21166 is, by its terms, limited to projects for which an EIR has been prepared. Plaintiff argues that the omission of any reference to negative declarations reflects a legislative intent to exclude projects initially approved via negative declaration from the subsequent review framework of section 21166, and instead to require a new round of initial study each time changes are proposed in project plans or circumstances. We disagree.

To begin with, the omission of any reference to negative declarations in section 21166 is less revealing than plaintiff suggests. At the time section 21166 was enacted in 1972, no provision of CEQA referred to negative declarations; the category of negative declarations originated with the Resources Agency's promulgation of the first set of CEQA implementation guidelines the following year. (See *No Oil*, *supra*, 13 Cal.3d at p. 74 and fn. 2, citing former Cal. Admin. Code, tit. 14, § 15083 [adopted 1973].) The Legislature subsequently ratified this innovation in 1976, when it amended CEQA to direct the Resources Agency to "include objectives and criteria for . . . the preparation of environmental impact reports *and negative declarations*." (Pub. Resources Code, § 21083, subd. (a), as amended by Stats. 2004, ch. 689, § 1, p. 5239, italics added.) Because, at the time of section 21166's enactment, EIRs were the only type of environmental document expressly referenced by CEQA's text, the Legislature could not have used the

18

phrase "environmental impact report" in section 21166 with any specific intent to exclude negative declarations from its scope.

Plaintiff directs our attention to the Legislature's 1977 amendments to CEQA in Assembly Bill No. 884 (AB 884), which, among other things, amended section 21166 to add a provision for the preparation of subsequent or supplemental EIRs based on the discovery of new information. (See Stats. 1977, ch. 1200, § 16, p. 4003.) Plaintiff observes that while the Legislature did not amend section 21166 to add a reference to negative declarations, it did add two statutory provisions that do specifically refer to negative declarations. (See Pub. Resources Code, § 21080.1 ["The lead agency shall be responsible for determining whether an environmental impact report [or] a negative declaration . . . shall be required for any project which is subject to [CEQA]. That determination shall be final and conclusive on all persons . . . unless challenged as provided in Section 21167."]; *id.*, § 21080.3, subd. (a) ["Prior to determining whether a negative declaration or environmental impact report is required for a project, the lead agency shall consult with all responsible agencies . . . ."].) Plaintiff argues that the Legislature's failure to add a similar reference to section 21166 demonstrates its intent to limit section 21166's reach to projects initially approved via EIR, and to treat any and all changes to projects initially approved via negative declaration as though they were entirely new projects for purposes of section 21151 review.

Plaintiff here places more weight on the 1977 amendments than they can bear. Given that the Guidelines had already authorized the use of negative declarations without express statutory authorization — a development the Legislature had ratified the previous year — the Legislature simply may not have perceived a need to add an express reference to negative declarations in section 21166. But in any event, when the 1977 amendments did refer to negative declarations, it was in order to affirm that a lead agency's decision to proceed by

19

negative declaration is entitled to the same degree of finality as a decision to proceed by EIR.  (Pub. Resources Code, § 21080.1.)  In light of that provision, plaintiff's reading of the 1977 amendments — as implicitly requiring agencies to start the environmental review process over each time there is a change in plans or circumstances, no matter how minor — is an unlikely one.

Ultimately, plaintiff's argument simply highlights a gap in CEQA's statutory structure.  No provision of CEQA directly addresses the subsequent environmental review obligations for projects that were initially approved via negative declaration.  CEQA authorizes the Resources Agency to fill such gaps in the statutory scheme, so long as it does so in a manner consistent with the statute.  (See Pub. Resources Code, §§ 21082–21083; *City of Santa Ana v. City of Garden Grove* (1979) 100 Cal.App.3d 521, 529 [the CEQA "statute empowers [the] administrative agency to exercise a judgment of high order in implementing legislative policy"].)  And in the year following the 1977 amendments, the Resources Agency filled that gap by extending the predecessor to CEQA Guidelines section 15162 to projects initially approved by negative declaration.  (See former Cal. Admin. Code, tit. 14, § 15067 [adopted 1978].)

Limiting agencies' postapproval review obligations for projects that were initially approved via negative declaration is wholly consistent with a statutory scheme in which negative declarations, no less than EIRs, are entitled to a presumption of finality once adopted.  (See Pub. Resources Code, § 21080.1, subd. (a).)  As explained in *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1479–1480 (*Benton*):  "In a case in which an initial EIR has been certified, section 21166 comes into play precisely because in-depth review of the project has already occurred, the time for challenging the sufficiency of the original CEQA document has long since expired, and the question before the agency is whether circumstances have changed enough to justify repeating a substantial portion of

20

the process. [Citations.] These same principles apply with even greater force in a case such as this," in which the project "initially raised so few environmental questions that an EIR was *not* required, but a negative declaration was found to satisfy the environmental review requirements of CEQA." The alternative that plaintiff proposes — which would restart the CEQA process every time plans or circumstances change, or whenever new information comes to light — "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." (*Marsh*, *supra*, 490 U.S. at p. 373; see also *Laurel Heights*, *supra*, 47 Cal.3d at p. 396 [noting the original environmental review process includes consideration of reasonably foreseeable future expansions to the project, and that subsequent EIRs are necessary when evaluating future action *not* considered in the initial review].) The Resources Agency did not act unreasonably in concluding that the statutory scheme calls for some limitations on postapproval environmental review of projects initially approved via negative declaration.

Plaintiff's stronger arguments do not concern the Guidelines' limitations of postapproval environmental review as such, but instead focus on the substance of the limitations the Guidelines prescribe. As plaintiff points out, when an agency initially proposes a project, an EIR is required "whenever it can be fairly argued on the basis of substantial evidence that [a] project may have significant environmental impact." (*No Oil*, *supra*, 13 Cal.3d at p. 75; see Pub. Resources Code, § 21082.2, subd. (a) [requiring an EIR when a project "may" have a significant effect on the environment]; accord, § 21151, subd. (a).) Thus, when a reviewing court evaluates an agency's initial determination whether to proceed with an EIR, the court's function is "to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made. If there was substantial evidence that the proposed project might

21

have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR . . . because it could be 'fairly argued' that the project might have a significant environmental impact." (*Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002; see *Bowman*, *supra*, 185 Cal.App.3d at p. 1073 [" 'fair argument' " test is a question of law, permitting the court's independent analysis of the sufficiency of the evidence].) By contrast, when an agency proposes changes to a previously approved project, CEQA Guidelines section 15162 generally prohibits the agency from requiring a subsequent or supplemental EIR unless the agency determines, "on the basis of substantial evidence in the light of the whole record," that "[s]ubstantial changes . . . will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (CEQA Guidelines, § 15162, subd. (a).) Plaintiff argues that application of this substantial evidence standard to projects initially approved via negative declaration creates a loophole in the statutory scheme, allowing agencies to evade their obligation to prepare an EIR based on the more demanding "fair argument" standard, so long as the potential environmental effects of the project are caused by changes in the project after a negative declaration had been approved.

Plaintiff's argument would have force if the Guidelines did, in fact, create such a loophole. But the substantial evidence test referred to in the Guidelines does not, as plaintiff supposes, refer to substantial evidence that the project, as modified, will necessarily have significant environmental effects. It instead refers to substantial evidence that the proposed modifications will involve "[s]ubstantial changes" that "require major revisions of the previous EIR or negative declaration due to the involvement" of new or significantly more severe environmental effects. (CEQA Guidelines, § 15162, subd. (a); see *id.*, § 15384 [defining

22

"substantial evidence"].)  The distinction is important here, because whether "major revisions" will be required as a result of project changes necessarily depends on the nature of the original environmental document.  A negative declaration is permitted when "there is no substantial evidence that the project or any of its aspects *may* cause a significant effect on the environment" (CEQA Guidelines, § 15063, subd. (b)(2), italics added; see also Pub. Resources Code, §§ 21151, 21064.5), whereas an EIR is required when a project and project alternatives may have significant effects (*id.*, § 21002.1, subd. (a)).  When there is a proposal to modify a project originally approved through EIR, no "major revision" to the initial EIR is required if the initial EIR already adequately addresses any additional environmental effects that may be caused by the proposed modification.  In contrast, when a project is initially approved by negative declaration, a "major revision" to the initial negative declaration will necessarily be required if the proposed modification *may* produce a significant environmental effect that had not previously been studied.  (CEQA Guidelines, § 15162.)  Indeed, if the project modification introduces previously unstudied and potentially significant environmental effects that cannot be avoided or mitigated through further revisions to the project plans, then the appropriate environmental document would no longer be a negative declaration at all, but an EIR.**6**

**6**      We recognize that language in the appellate cases might be read as applying a different rule.  In *Benton*, *supra*, 226 Cal.App.3d 1467, for example, the Court of Appeal considered whether a proposal to relocate a winery that had previously been approved via negative declaration required the preparation of a subsequent or supplemental EIR.  *Benton* held that, under CEQA Guidelines section 15162, the question whether a subsequent or supplemental EIR was required depended on the effect of the proposed relocation; the changes were not an occasion to reopen the original environmental review of the winery project.  (*Benton*, at pp. 1482–1484.)  As the Court of Appeal in *Abatti* v. *Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650 later observed, "the central premise of *Benton* [is] that it makes

*(Footnote continued on next page.)*

In short, the substantial evidence standard prescribed by CEQA Guidelines section 15162 requires an agency to prepare an EIR whenever there is substantial evidence that the changes to a project for which a negative declaration was previously approved might have a significant environmental impact not previously considered in connection with the project as originally approved, and courts must enforce that standard.  (See *Friends of "B" Street v. City of Hayward*, *supra*, 106 Cal.App.3d at p. 1002.)  It therefore does not permit agencies to avoid their obligation to prepare subsequent or supplemental EIRs to address new, and previously unstudied, potentially significant environmental effects.  So understood, CEQA Guidelines section 15162 constitutes a valid gap-filling

_____

*(Footnote continued from previous page.)*

little sense to set a *lower* threshold for further environmental review of a project that is determined *not* to have a significant effect on the environment than section 21166 sets for a project that *may* have significant effects on the environment." (*Abatti*, at p. 673 [agreeing with the "central premise" of *Benton*].)  *Benton*'s longstanding interpretation has been followed by courts and the Resources Agency and is a correct statement of the law insofar as it recognizes that negative declarations, like EIRs, are entitled to a presumption of finality; it would, as *Benton* says, be "absurd" to require agencies to restart the entire process of environmental review from scratch each time the agency proposes any change, no matter how minor, simply because the project was previously approved by negative declaration.  (*Benton*, *supra*, 226 Cal.App.3d at p. 1480.)  But *Benton* went on to conclude that no subsequent or supplemental EIR was required in that case because, among other things, substantial evidence supported the agency's conclusion that "[t]he environmental impacts of the modification were not significant . . . ." (*Id*. at p. 1483.)  As seen, however, the inquiry prescribed by the Guidelines is not whether the environmental impacts of the modification are significant, but whether the modification requires major revisions to the negative declaration because of the involvement of new, potentially significant environmental effects that had not previously been considered in connection with the earlier environmental study.

24

measure as applied to projects initially approved via negative declaration, including the project at issue in this case.

## IV.

Finally, plaintiff contends that both section 21166 and CEQA Guidelines section 15162 are inapplicable because the District's initially approved project is akin to a plan, a phased project, or a program rather than a simple project. Relying on *Sierra Club*, *supra*, 6 Cal.App.4th 1307, plaintiff argues that the District's proposed changes to the plans for the Building 20 complex should therefore be treated as a new site-specific project that triggers new environmental review under CEQA's provisions for so-called "tiered" EIRs. (See Pub. Resources Code, §§ 21068.5, 21094.) The Court of Appeal appeared to accept this argument as further support for its conclusion that the project changes at issue may be considered a new project under a de novo standard of review. The argument also fails, however, because the tiering provisions — and therefore *Sierra Club*, *supra*, 6 Cal.App.4th 1307 (involving a tiered EIR) — have no direct application here.

Unlike "[p]roject EIR[s]," which "examine[] the environmental impacts of a specific development project" (CEQA Guidelines, § 15161), the CEQA provisions governing tiered EIRs "permit[] the environmental analysis for long-term, multipart projects to be 'tiered,' so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 429 (*Vineyard Area Citizens*); see CEQA Guidelines, § 15152 [" 'Tiering' refers to using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general

25

discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project."].)

"The standard for determining whether to engage in additional CEQA review for subsequent projects under a tiered EIR is more relaxed than the prohibition against additional review imposed by Public Resources Code section 21166 for project EIR's." (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 528.) For project EIRs, of course, a subsequent or supplemental impact report is required in the event there are substantial changes to the project or its circumstances, or in the event of material new and previously unavailable information. (*Ibid.*, citing § 21166.) In contrast, when a tiered EIR has been prepared, review of a subsequent project proposal is more searching. If the subsequent project is consistent with the program or plan for which the EIR was certified, then "CEQA requires a lead agency to prepare an initial study to determine if the later project may cause significant environmental effects not examined in the first tier EIR." (*Ibid.*, citing Pub. Resources Code, § 21094, subds. (a), (c).) "If the subsequent project is not consistent with the program or plan, it is treated as a new project and must be fully analyzed in a project—or another tiered EIR if it may have a significant effect on the environment." (*Friends of Mammoth*, at pp. 528–529.)

In *Sierra Club*, on which plaintiff relies, a county approved a project through a program EIR, a type of tiered EIR where the agency first analyzes "general matters contained in a broader [initial] EIR . . . with later EIRs and negative declarations [analyzing] narrow projects." (CEQA Guidelines, § 15152, subd. (a); see *id*., § 15168.) The *Sierra Club* court concluded that when a program EIR is employed, if a later proposal is not "either the same as or within the scope of the project . . . described in the program EIR," then review of the proposal is not governed by section 21166's deferential substantial evidence standard. (*Sierra*

26

*Club*, *supra*, 6 Cal.App.4th at p. 1321, citing CEQA Guidelines, § 15168, subd. (c)(5).) Instead, under Public Resources Code section 21094, the agency is required to apply a more exacting standard to determine whether the later project might cause significant environmental effects that were not fully examined in the initial program EIR. (*Sierra Club*, at p. 1321; Pub. Resources Code, § 21094, subd. (c).)

Unlike the program EIR at issue in *Sierra Club*, the 2006 initial study and MND were not a tiered EIR. The District's 2006 initial study and MND did not purport "to defer analysis of certain details of later phases of long-term linked or complex projects until those phases are up for approval." (*Vineyard Area Citizens*, *supra*, 40 Cal.4th at p. 431.) The District's initial environmental review documents instead expressly concluded that "all potential impacts" of the entire project — including *every* building on the campus — had "been mitigated to a point where no significant impacts would occur, and there is no substantial evidence the project would have a significant effect on the environment." (San Mateo County Community College Dist., Proposed Mitigated Negative Declaration (Dec. 20, 2006) p. 2; see also San Mateo County Community College Dist., Initial Study and Mitigated Negative Declaration for Facility Improvements at College of San Mateo (Dec. 2006) p. 2 [describing the project and various encompassed improvements, including those related to the Building 20 complex].) To now entertain the argument that the 2006 MND should be treated as a tiered EIR would disregard the substance of the District's conclusions in order to permit plaintiff to raise an untimely challenge as to the adequacy of the MND, as well as the District's decision to proceed by MND in the first place.

## V.

Our conclusion today does not end this case. Plaintiff argues that even if the proposed changes to the earlier-approved project do not render it a new project

27

altogether, the District abused its discretion in approving the Building 20 complex demolition based on the 2006 MND and the 2011 addendum. Plaintiff also argues that CEQA Guidelines sections 15162 through 15164 improperly authorize lead agencies to approve certain proposed project modifications through the use of addenda without public comment, rather than requiring the issuance of a subsequent or supplemental EIR or negative declaration. The Court of Appeal did not address these questions, nor are they fairly encompassed by the question on which we granted review, and we accordingly express no view on them.

## VI.

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.


**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Friends of College of San Mateo Gardens v. San Mateo Co. Community College
_____

**Unpublished Opinion** XXX NP opn. filed 9/26/13, 1st Dist., Div. 1
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S214061
**Date Filed:** September 19, 2016
_____

**Court:** Superior
**County:** San Mateo
**Judge:** Clifford Cretan

_____

**Counsel:**

Eugene Whitlock, County Counsel; Remy Moose Manley, James G. Moose, Sabrina V. Teller and John T. Wheat for Defendants and Appellants.

Cox, Castle & Nicholson, Andrew B. Sabey and Linda C. Klein for California Building Industry Association, Building Industry Association of the Bay Area and California Business Properties Association as Amici Curiae on behalf of Defendants and Appellants.

Michael W. Graf for High Sierra Rural Alliance as Amicus Curiae on behalf of Defendants and Appellants.

Downey Brand, Christian L. Marsh, Andrea P. Clark and Amanda M. Pearson for League of California Cities, California State Association of Counties and Association of California Water Agencies as Amici Curiae on behalf of Defendants and Appellants.

Charles F. Robinson, Kelly L. Drumm; Holland & Knight, Amanda Monchamp and Joanna Meldrum for The Regents of the University of California as Amicus Curiae on behalf of Defendants and Appellants.

Brandt-Hawley Law Group and Susan Brandt-Hawley for Plaintiff and Respondent.

Chatten-Brown & Carstens, Jan Chatten-Brown , Amy Minteer and Josh Chatten-Brown for California Preservation Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

Law Office of Sara Hedgpeth-Harris, Inc., and Sara Hedgpeth-Harris for Association of Irritated Residents, Madera Oversight Coalition, Revive the San Joaquin and Sierra Club as Amici Curiae on behalf of Plaintiff and Respondent.

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, Tracy L. Winsor and Jeffrey P. Reusch, Deputy Attorneys General, for California Natural Resources Agency and Governor's Office of Planning and Research as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Sabrina V. Teller
Remy Moose Manley
555 Capitol Mall, Suite 800
Sacramento, CA  95814
(916) 443-2745

Susan Brandt-Hawley
Brandt-Hawley Law Group
P.O. Box 1659
Glen Ellen, CA  95442
(707) 938-3900